March 16, 1993

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-2158

IN RE DONALD PEARSON, ET AL.,

Petitioners.

ON PETITION FOR WRIT OF MANDAMUS
FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. A. David Mazzone, U.S. District Judge]

Before

Breyer, Chief Judge,

Aldrich, Senior Circuit Judge,

and Selya, Circuit Judge.

David R. Geiger, with whom Joseph D. Halpern, Michele A.

Whitham, Sarah Burgess Reed, and Foley, Hoag & Eliot were on

brief, for petitioners.
William L. Pardee, Assistant Attorney General, with whom

Scott Harshbarger, Attorney General, was on brief, for

respondents.

March 16, 1993

SELYA, Circuit Judge. Petitioners seek a writ of
SELYA, Circuit Judge.

mandamus which, if granted, will halt the district court's

nascent efforts to probe the continuing need for, or the possible

modification of, consent decrees affecting the operation of a

state institution, the Massachusetts Treatment Center for

Sexually Dangerous Persons (the Treatment Center). Because

petitioners cannot satisfy the strict prerequisites for

extraordinary relief by way of mandamus, we dismiss the petition.

I. BACKGROUND

The United States District Court for the District of

Massachusetts has been involved with the Treatment Center for

more than two decades. In 1974, the district court entered a

consent decree and supplemental consent decree in the case of

King v. Greenblatt.1 The decrees placed the Treatment Center

under the primary authority of the Massachusetts Department of

Mental Health and obligated the department to operate the

facility in accordance with certain standards. The district

court specifically retained the right to amend the King decrees

in the future.

Although the original plaintiff, King, soon left the

Treatment Center, other residents took up the cudgels. Over

time, inmates brought a variety of suits to enforce the decrees.

1King, an individual confined at the Treatment Center,
brought suit, inter alia, to reform certain institutional

policies and practices. Relevant portions of the original and
supplemental consent decrees are set forth as appendices in two
earlier decisions of this court. See Pearson v. Fair, 935 F.2d

401, 416-19 (1st Cir. 1991); Langton v. Johnston, 928 F.2d 1206,

1227-28 (1st Cir. 1991).

2

The stream of litigation occasionally overflowed the district

court. See, e.g., Pearson v. Fair, 935 F.2d 401 (1st Cir. 1991)

(Pearson II); Langton v. Johnston, 928 F.2d 1206 (1st Cir. 1991);

Pearson v. Fair, 808 F.2d 163 (1st Cir. 1986) (per curiam)

(Pearson I). The petitioners, all of whom were originally

inmates of the Treatment Center and at least one of whom still

resides there, have been at the eye of the storm. In the early

1980s, they brought an action to enforce the King decrees, see

Pearson I, 808 F.2d at 165, and subsequently survived the

Commonwealth's challenge to their alleged lack of standing. See

Pearson II, 935 F.2d at 404 n.4. Moreover, in 1988, the

petitioners intervened in the King case and fended off the

Commonwealth's motion to vacate the judgment therein.

The continuing saga of the federal courts' involvement

with the Treatment Center took a new turn in 1992 when the

district court, acting on its own initiative and without

providing advance notice, appointed a special master to analyze

"the impact of existing and pending legislation on the consent

decrees" and on "the operation of the Treatment Center"; to study

all unresolved claims alleging violations of the consent decrees;

and to advise the court concerning the Treatment Center's

operation and the continued viability of the King decrees.2

The petitioners learned of this initiative after the

fact. They did not take kindly to it. When the district court

2The district court's order is reproduced in the appendix.
We omit therefrom the master's curriculum vitae.

3

refused to alter its stance, the petitioners headed for the court

of appeals. In this forum, they ask for mandamus, asserting that

the lower court lacked jurisdiction to appoint a master because

King was dead, juridically if not literally, and because neither

side was currently seeking, or had recently sought, modification

of the King decrees. Petitioners also assert a host of other

challenges to the entry of the order and to its scope.

II. THE USES OF MANDAMUS

Congress has authorized the federal courts to issue

prerogative writs which are "necessary or appropriate in aid of

their respective jurisdictions." 28 U.S.C. 1651(a) (1988). As

the Court recently reminded us, a traditional use of prerogative

writs has been to confine inferior courts to the lawful exercise

of their prescribed jurisdiction or compel them to exercise their

authority when duty demands. See Mallard v. United States Dist.

Court, 490 U.S. 296, 308 (1989) (quoting Roche v. Evaporated Milk

Ass'n, 319 U.S. 21, 26 (1943)). This use is customarily

accomplished by means of mandamus or prohibition (terms which we

employ interchangeably in this opinion). Such writs afford a

mechanism for immediate correction of acts or omissions amounting

to an "usurpation of power." De Beers Consolid. Mines, Ltd. v.

United States, 325 U.S. 212, 217 (1945).

Prerogative writs are drastic remedies which have the

potential, if overexercised, "to spawn piecemeal litigation and

disrupt the orderly processes of the justice system." In re

Recticel Foam Corp., 859 F.2d 1000, 1005 (1st Cir. 1988). Thus,

4

mandamus must be used sparingly and only in extraordinary

situations. See Allied Chem. Corp. v. Daiflon, Inc., 449 U.S.

33, 34 (1980) (per curiam); Will v. United States, 389 U.S. 90,

107 (1967); In re Insurers Syndicate, 864 F.2d 208, 211 (1st Cir.

1988); see also Boreri v. Fiat S.p.A., 763 F.2d 17, 26 (1st Cir.

1985) (warning that the writ's "currency is not profligately to

be spent").

To ensure that the writ's use is appropriately

rationed, we have, for the most part,3 insisted that a writ-

seeker limn "some special risk of irreparable harm," together

with "clear entitlement to the relief requested." Recticel, 859

F.2d at 1005; accord In re Bushkin Assocs., Inc., 864 F.2d 241,

243 (1st Cir. 1989); In re Justices of the Supreme Court of

Puerto Rico, 695 F.2d 17, 20 (1st Cir. 1982).4 On the former

prong, the petitioner "must ordinarily demonstrate that something

3We qualify our statement because there are infrequent cases
in which the usual requirements may be relaxed. See, e.g., In re

Justices of the Supreme Court of Puerto Rico, 695 F.2d 17, 25

(1st Cir. 1982); see also In re Ellsberg, 446 F.2d 954, 956-57

(1st Cir. 1971). Such cases invariably involve issues of great
public import, justifying resort to advisory mandamus. See

generally Recticel, 859 F.2d at 1005 n.4 (describing types of

cases in which advisory mandamus may be suitable). The
petitioners do not suggest, and we cannot conclude, that the
matters implicated here fall into that category.

4In one sense, the "clear entitlement" language is a
misnomer. It seems more accurate to say that a petitioner's
entitlement to the writ depends on a two-tiered showing that the
district court's order (a) presents a special risk of significant
irreparable harm and (b) is palpably erroneous. See La Buy v.

Howes Leather Co., 352 U.S. 249, 256 (1957). We use the phrase

"palpably erroneous" to signify a situation in which the claimed
vice is plain as a matter of law and is also substantially
prejudicial as a matter of fact.

5

about the order, or its circumstances, would make an end-of-case

appeal ineffectual or leave legitimate interests unduly at risk."

Recticel, 859 F.2d at 1005-06; accord United States v. Sorren,

605 F.2d 1211, 1215 (1st Cir. 1979). On the latter prong, the

petitioner must usually establish a "clear and indisputable"

right to the requested relief, Bankers Life & Cas. Co. v.

Holland, 346 U.S. 379, 384 (1953) (quoting United States v.

Duell, 172 U.S. 576, 582 (1899)), or, in other words, that the

challenged order is palpably erroneous. See supra note 4. This

dichotomous standard is sufficiently stringent that

"[i]nterlocutory procedural orders . . . rarely will satisfy

th[e] precondition for mandamus relief." Recticel, 859 F.2d at

1006. Nonetheless, a district court's appointment of a master

may be so far afield, and the potential for mischief so great in

a particular situation, that immediate relief by way of mandamus

is warranted. See, e.g., La Buy v. Howes Leather Co., 352 U.S.

249, 256 (1957); National Org. for the Reform of Marijuana Laws

(NORML) v. Mullen, 828 F.2d 536, 541-42 (9th Cir. 1987).

III. DISCUSSION

Because petitioners' variegated challenges reflect

neither a special risk of significant harm nor palpable error

attributable to the judge's interlocutory order, mandamus is not

justified. For ease in presentation, we discuss these points in

reverse order.

A. Presence of Palpable Error.

The petitioners have failed to demonstrate that the

6

district court lapsed into palpable error or, stated another way,

that they are clearly entitled to the relief requested. To

explain why this is so, we deal extensively with petitioners'

main "case or controversy" approach and then consider their other

asseverations in a group.

1. The Case or Controversy Requirement. Petitioners
1. The Case or Controversy Requirement.

strive to convince us that, at the time the district court

appointed the master, no justiciable case or controversy existed;

and that, therefore, the court's order plainly outstripped its

jurisdiction. Petitioners' exhortation has two strands. We find

neither strand persuasive.

a.
a.

The first strand might be subtitled: "On the Death of

King." Petitioners suggest that King was a "dead case" which the

district court improperly resurrected. Whatever this morbid

metaphor may mean, it misses the mark. The entry of a consent

decree does not "kill" a case or terminate a district court's

jurisdiction. Rather, when, as now, an injunction entered

pursuant to a consent decree has ongoing effects, the issuing

court retains authority to enforce it. See, e.g., System Fed'n

No. 91, Etc. v. Wright, 364 U.S. 642, 647 (1961) (explaining that

structural injunctions "often require[] continuing supervision by

the issuing court and always a continuing willingness to apply

its powers and processes on behalf of the party who obtained

th[e] equitable relief"). By the same token, a court retains

authority to modify or interpret such decrees in light of changed

7

circumstances. See, e.g., id. at 646-47; United States v. Swift

& Co., 286 U.S. 106, 114-15 (1932). This authority is part of a

court's inherent powers and exists regardless of whether a

particular consent decree expressly so provides.5 See Swift,

286 U.S. at 114; see also Fed. R. Civ. P. 60(b)(5)-(6).

Since a district court has power to modify a consent

decree, it is impossible to say that the court below acted "in

clear excess" of its power, In re Justices, 695 F.2d at 21, in

taking the much more tentative step of appointing a master to

investigate the possibility of modifying the decree. See Chicago

Housing Auth. v. Austin, 511 F.2d 82, 83 (7th Cir. 1975) (raising

no question as to jurisdiction in such a context). In other

words, nothing about the lower court's raising of a moistened

finger to test the winds implicated jurisdictional concerns.

To be sure, petitioners place great emphasis on the

fact that the original plaintiff, King himself, no longer resides

at the Treatment Center. Because of this fact, and because the

King case was never certified as a class action, petitioners

categorize the case as defunct. We believe this taxonomy is too

simplistic. In the first place, the King case is not dead; it

is, at worst, moribund. Even that description may be overly

pessimistic; petitioners themselves became parties in King five

years ago (when the district court granted their motion to

intervene), and their status as parties has not been altered by

5Here, of course, the district judge explicitly reserved the
power to amend. See Pearson I, 808 F.2d at 165.

8

any subsequent order. In the second place, the King decrees have

ongoing effects and other inmates continue to bring actions

seeking their enforcement. The district court obviously gave

weight to this reality, noting the "many cases filed by patients

at the Treatment Center." Moreover, in opting to appoint a

master, the court made specific reference to contemporaneous

allegations about institutional failings gathered by forty-eight

Treatment Center residents desirous of improving their lot.6

All things considered, we find the tales of King's demise to be

greatly exaggerated.

b.

The second, more substantial, salvo of petitioners'

jurisdictional assault bombards the spontaneous character of the

district court's action. This fusillade also goes awry. We

believe that a district court's jurisdiction to modify a consent

decree necessarily implies that the court does not act in clear

excess of its authority when it appoints a master, sua sponte, to

look into possible decree-modifying changes. We explain briefly.

A consent decree is not simply a contract entered into

between private parties seeking to effectuate parochial concerns.

See Firefighters v. Cleveland, 478 U.S. 501, 519 (1986); United

6Although these grievances were contained in a letter to the
judge, rather than in a lawsuit, petitioners apparently concede
that the district court possessed the authority to docket the
letter as a pro se complaint. We agree. See Haines v. Kerner,

404 U.S. 519, 520 (1972) (per curiam); Soto v. United States

Postal Serv., 905 F.2d 537, 539 (1st Cir. 1990), cert. denied,

111 S. Ct. 679 (1991); McCall-Bey v. Franzen, 777 F.2d 1178, 1190

(7th Cir. 1985); Gale v. United States Dep't of Justice, 628 F.2d

224, 226-27 (D.C. Cir. 1980).

9

States v. ITT Continental Baking Co., 420 U.S. 223, 236 n.10

(1975). The court stands behind the decree, ready to interpret

and enforce its provisions. This ongoing supervisory

responsibility carries with it a certain correlative discretion.

See Wright, 364 U.S. at 648. Unlike petitioners, we do not

envision a vast jurisdictional limbo in which courts forced to

exercise their equity powers remain powerless to question whether

what they have been doing "has been turned through changing

circumstances into an instrument of wrong." Swift, 286 U.S. at

115. Put bluntly, "parties cannot, by giving each other

consideration, purchase from a court of equity a continuing

injunction." Wright, 364 U.S. at 651.

This is especially so when, as in the instant case, a

consent decree calls for judicial supervision of a government-run

facility. In so ramified a setting, a court's decrees implicate

the citizenry's interests as well as those of the parties and

bear directly on the salubrious operation of public institutions.

See Heath v. De Courcy, 888 F.2d 1105, 1109 (6th Cir. 1989)

(acknowledging that such decrees "reach beyond the parties

involved directly in the suit"); New York State Ass'n for

Retarded Children, Inc. v. Carey, 706 F.2d 956, 969 (2d Cir.)

(deeming it "well recognized that in institutional reform

litigation . . . judicially-imposed remedies must be open to . .

. accommodation of a wider constellation of interests than is

represented in the adversarial setting of the courtroom"), cert.

denied, 464 U.S. 915 (1983). In institutional reform litigation,

10

injunctions should not operate inviolate in perpetuity. See Rufo

v. Inmates of the Suffolk County Jail, 112 S. Ct. 748, 762-65

(1992); Board of Educ. v. Dowell, 111 S. Ct. 630, 637 (1991); see

also Milk Wagon Drivers Union v. Meadowmoor Dairies, Inc., 312

U.S. 287, 298-99 (1941) (explaining that continuation of an

injunction is justified only by continuation of the circumstances

which induced it). This must mean that, notwithstanding the

parties' silence or inertia, the district court is not doomed to

some Sisyphean fate, bound forever to enforce and interpret a

preexisting decree without occasionally pausing to question

whether changing circumstances have rendered the decree

unnecessary, outmoded, or even harmful to the public interest.

Against this backdrop, the fact that the court acted

sua sponte is not fatal. After all, Fed. R. Civ. P. 53, which

governs the appointment of masters, does not necessitate a motion

as a condition precedent to judicial action. Taking our lead

from the rule itself, we hold that a district court is not

jurisdictionally disabled from acting on its own initiative in

appointing a master to ascertain the need for alteration of its

ongoing activities under a consent decree.7 Cf., e.g., INS v.

7In its present posture, this case does not require that we
decide whether, or when, a district court may actually modify a
consent decree sua sponte. See Hook v. Arizona Dep't of

Corrections, 972 F.2d 1012, 1016 (9th Cir. 1992) (stating that no

justiciable controversy exists where a court proceeds to revise a
consent decree although neither party had moved for modification
as required by Fed. R. Civ. P. 60(b)); Cook v. Birmingham News,

618 F.2d 1149, 1152 (5th Cir. 1980) (similar). The court below
has been circumspect, appointing a master only for limited
investigatory and advisory purposes. Moreover, some parties to
the litigation, most notably the defendants (who have agreed to

11

Chadha, 462 U.S. 919, 939-40 (1983) (explaining that, to be

constitutionally sufficient, a case or controversy need not stem

exclusively from the adversarial positions of the litigants but

may stem from the real-world effect of a court's actions); Gomes

v. Moran, 605 F.2d 27, 30 (1st Cir. 1979) (holding that a

district court did not exceed its powers when it refused to bind

defendants to an "incorrect" decree despite their failure to

request a modification).

2. Petitioners' Other Arguments. None of petitioners'
2. Petitioners' Other Arguments.

remaining asseverations reveals error of a kind or to a degree

required to justify a writ of mandamus. We deal in summary

fashion with certain of these asseverations, dismissing the

remainder without comment.

a.

Citing La Buy, 352 U.S. at 256, petitioners contend

that the order of reference constitutes an "abdication of the

judicial function" to a non-Article III adjudicator. Here,

however, unlike in La Buy or in Stauble v. Warrob, Inc., 977 F.2d

690 (1st Cir. 1992) (where the district court referred the entire

case to a master for trial and adjudication), we think it far

from clear that the master's mission, as presently constituted,

defray the master's fees for the time being and who have argued
in this court against the issuance of a prerogative writ), are in
agreement with the decision. Hence, we cannot say, on the record
as it currently stands, that the district court's action is
tantamount to a gratuitous modification of the consent decrees.
Cf. Thompson v. Enomoto, 815 F.2d 1323, 1327 (9th Cir. 1987)

(ruling that the appointment of a special master is not an
immediately appealable modification of a decree).

12

extends beyond permissible bounds. All that can be gleaned from

the record before us is that the district court seeks information

about the efficacy of an ongoing injunction. On its face, this

seems a concinnous use of a master. See Stauble, 977 F.2d at 695

(discussing use of masters in connection with "remedy-related

issues"); Chicago Housing Auth., 811 F.2d at 83-84 (refusing to

annul appointment of master in analogous circumstances); see

generally Vincent Nathan, The Use of Masters in Institutional

Reform Litigation, 10 U. Tol. L. Rev. 419, 443-44 (1979). The

order's scope, as the judge has delineated it, seems more akin to

rendering "mere assistance" to the court, a permissible use of a

master in many sets of circumstances, Stauble, 977 F.2d at 695,

than to abdicating adjudication of "fundamental question[s]," an

impermissible use under any non-consensual set of circumstances.

Id.

b.

It is also argued that the court's designation of a

master should be obliterated because Rule 53's core requirement

the bedrock concept that references are reserved for the rare

cases which present "some exceptional condition," Fed. R. Civ. P.

53(b) is completely unfulfilled. We disagree.

The case at hand is intricate. Its circumstances are

highly ramified. "Change" has been the watchword virtually ever

since the consent decrees were entered. See, e.g., Langton, 928

F.2d at 1209-10 & nn. 2-4 (describing certain changes in

pertinent legislation over time); id. at 1212-13 (describing

13

substantial changes in facilities and conditions of confinement);

id. at 1213-16 (describing sweeping changes in treatment

modalities, programs, and the like). After two decades of

intimate involvement with an especially complex public

institution immersed in a state of continuing transition, the

district court is still mired in litigation. We think that this

scenario at least arguably reflects an exceptional condition.

Hence, appointing a master to survey the legislative landscape,

investigate the incidence and impact of changed circumstances,

assess the current relevance of the decrees, and report the

results to the court did not constitute palpable error as a

matter of law. See, e.g., Chicago Housing Auth., 511 F.2d at 83-

84 (refusing to annul district court's appointment of master in

analogous circumstances); see also NORML, 828 F.2d at 543-45

(explaining that complexity of litigation and of decree-

compliance can justify appointment of a master in institutional

reform litigation); Carey, 706 F.2d at 962-63 (similar).

c.

Petitioners next complain that some of the matters

referred to the master outstrip the four corners of the pleadings

in King. The short answer to this plaint is that the order's

text does not bear it out. The slightly longer (but equally

availing) answer is that the litigation's procedural posture is

still fluid. The district court has before it a number of

complaints dealing with various aspects of life at the Treatment

Center. The order plainly indicates that the court proposes to

14

treat these cases as a group, at least for some (as yet

undefined) purposes. Class certification remains a seemingly

viable option. To the extent (if at all) that the court intends

the order of reference to extend beyond the sequestration-type

issues originally involved in King, we presume that the court

will travel an appropriate procedural path. See, e.g., Fed. R.

Civ. P. 42(a) (discussing requirements for consolidation of

actions); Fed. R. Civ. P. 23 (discussing prerequisites to class

action and related matters); Fed. R. Civ. P. 24 (discussing

requirements for intervention). We see no reason, therefore,

given the confined office of a petition for mandamus, to stop the

court in its tracks.

d.

Finally, petitioners claim that the district court

failed to provide them with notice before appointing the master.

They say, moreover, that this omission was exacerbated by an ex

parte contact with respondents' counsel (a contact which, as a

byproduct, gave respondents advance warning of the judge's

mindset). We do not believe that, under the totality of the

circumstances, these facts warrant the issuance of a prerogative

writ.

While it seems logical for a trial court to consult

with affected parties when contemplating the appointment of a

master, the relevant procedural rule does not explicitly require

prior notice, see Fed. R. Civ. P. 53, and we are unprepared to

state that advance consultation is absolutely essential in every

15

instance.8 Cf. Gary W. v. Louisiana, 601 F.2d 240, 244 (5th

Cir. 1979) (holding that a district court is not obliged to

convene an evidentiary hearing anent whether to appoint a

master). In this context, the purpose served by prior notice is

threefold: it permits parties to (1) argue for or against the

very idea of appointing a master, see, e.g., id. at 244-45, (2)

offer their views on the scope of any reference, see, e.g.,

Stauble, 977 F.2d at 694-96 (discussing scope considerations),

and (3) voice their preferences as to the master's identity.

See, e.g., Morgan v. Kerrigan, 530 F.2d 401, 426-27 (1st Cir.),

cert. denied, 426 U.S. 935 (1976). As we have already indicated,

the reasons for appointing a master here are sensible and self-

evident; the scope of the reference is unremarkable; and, lastly,

the petitioners have neither expressed dissatisfaction with the

individual selected as the master nor proffered any person whom

they deem a more auspicious choice. In this unique situation,

the incidence of any error is problematic; and, at any rate, the

failure to provide notice seems benign.

The ex parte contact does not stem the tide. It

appears that the judge, seeking to secure a commitment from the

Commonwealth to absorb the master's costs, directed a clerk to

8Nonetheless, we agree with the Ninth Circuit that, when an
order of reference is entered sua sponte and without notice, a

party who considers himself aggrieved thereby will be given
considerable latitude as to the form and timeliness of an ensuing
objection. See Burlington N. R.R. Co. v. Department of Revenue,

934 F.2d 1064, 1070-71 (9th Cir. 1991).

16

call the attorney general's department.9 We agree with the

petitioners that even this indirect inquiry should not have been

conducted ex parte. In our adversary system, both the

administration of justice and the appearance of justice demand

that courts refrain, by and large, from communicating with one

party to the exclusion of the other(s). See, e.g., Meridian

Int'l Logistics, Inc. v. United States, 939 F.2d 740, 745 (9th

Cir. 1991) (stating the familiar rule that ex parte contacts by

the judge are not the norm); see also Model Code of Judicial

Conduct, Canon 3B(7) (1990). Yet in this instance, the

communication was wholly innocuous and petitioners have been

unable to suggest how the judge's lapse was harmful. Because the

court's impetuosity was in no way prejudicial, issuance of a

prerogative writ would be tantamount to using a bazooka to slay a

gnat. We decline to engage in such judicial overkill. See

Grieco v. Meachum, 533 F.2d 713, 719 (1st Cir.) (applying

harmless-error analysis where alleged ex parte contact caused no

cognizable harm), cert. denied, 429 U.S. 858 (1976); United

States v. DeLeo, 422 F.2d 487, 499 (1st Cir.) (same), cert.

denied, 397 U.S. 1037 (1970); see also Raytheon Co. v. Automated

Business Sys., Inc., 882 F.2d 6, 8 n.2 (1st Cir. 1989) (similar;

involving arbitrator's ex parte contact).

B. Special Risk of Irreparable Harm.

9Petitioners hint that the contact may have been more
sinister, but they offer no support for their suspicions. We
confine our evaluation, therefore, to the demonstrable facts of
record.

17

Although it may be unnecessary to do so given

petitioners' failure to show palpable error, we take this

occasion to remark that petitioners likewise flunk the first part

of the conventional mandamus test: they offer no satisfactory

reason to believe that they will suffer irremediable harm if the

writ does not issue. The order that petitioners challenge is

merely preliminary. The only thing that it accomplishes is the

appointment of a master to conduct certain studies, analyses, and

investigations, compile a report, and thereafter make

recommendations to the district judge. We decline petitioners'

invitation to speculate, at this early date, about the purely

hypothetical consequences that may or may not flow from these

operose labors.10 Accord Chicago Housing Auth., 511 F.2d at 83

(rejecting similar challenge to similar order of reference).

Leaving rank speculation aside, we can detect no other

harm of a kind sufficient to ground mandamus relief. Certainly,

any increased workload that may result from the master's

involvement cannot turn the trick. We have consistently rejected

the general burdensomeness of litigation, standing alone, as

comprising a showing of harm sufficient to animate the power of

10Petitioners' argument on this point is built entirely on
the fragile foundation of conjecture and surmise. By way of
illustration, they ruminate that, if the master makes findings
concerning, say, the ability of Treatment Center personnel to
function under the King decrees, the district court may give such

findings overly great deference. We prefer, however, to deal
with the actuality of a developed situation rather than to
anticipate that a federal district court will lapse into manifest
error. Cf. W. Shakespeare, Macbeth, act I, sc. iii, ll. 133-34

(1605) (suggesting that, frequently, "present fears are less than
horrible imaginings").

18

mandamus.11 See, e.g., Recticel, 859 F.2d at 1006 n.5; In re

Justices, 695 F.2d at 20.

IV. CONCLUSION

We need go no further. Mandamus is an extraordinary

remedy which "should be dispensed sparingly and only in pursuance

of the most carefully written prescription, not made available

over the counter, on casual demand. It is not a substitute for

interlocutory appeal." Recticel, 859 F.2d at 1005. In its

present posture, this case does not warrant a dose of such strong

medicine. The record here is, for the most part, malady-free;

and any symptoms of arguable error, if later shown to have

blossomed into full blown diseases, are amenable to a traditional

cure on direct appeal.

The petition for mandamus is denied and dismissed.

Costs to respondents.

11Petitioners argue that the Court's opinion in Mallard

marked the dawning of a new era, calling our prior precedents
into serious question. We disagree. Mallard did not deal with

the general burdensomeness of litigation at all; rather, the case
involved an attorney compelled by a court to provide professional
services against his will. See Mallard, 490 U.S. at 300.

19