<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                United States Court of Appeals
                    For the First Circuit

                                 

No. 98-1244

                     STATE OF NEW HAMPSHIRE
    (DEPARTMENT OF CORRECTIONS AND DEPARTMENT OF EDUCATION),

                     Petitioner, Appellee,

                               v.

                          MARC ADAMS,

                     Respondent, Appellant.

          APPEAL FROM THE UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF NEW HAMPSHIRE

        [Hon. Steven J. McAuliffe, U.S. District Judge]

                             Before

                     Selya, Circuit Judge,
                                
          Aldrich and Coffin, Senior Circuit Judges.
                                

    Jon Meyer, with whom Backus, Meyer, Solomon, Rood & Branch,
Peter S. Smith, and Disabilities Rights Center were on brief, for
appellant.
    Nancy J. Smith, Assistant Attorney General, with whom Philip
T. McLaughlin, Attorney General, was on brief, for appellee.

November 12, 1998

 SELYA, Circuit Judge.  After the district court denied
Marc Adams' application for attorneys' fees on the ground that he
had not prevailed in proceedings under the Individuals with
Disabilities Education Act (IDEA), 20 U.S.C.  1400-1485, Adams
launched this appeal.  We affirm.
I.  BACKGROUND
 In 1991, a New Hampshire state court sentenced Adams to
15-to-30 years in the state penitentiary for manslaughter.  After
Adams began serving his sentence (at age 20), he pointed to a
learning disability, alleged a denial of his entitlement to a free
and appropriate public education (FAPE) under the IDEA, and
requested a due process hearing.  Prior to the hearing, the parties
reached an accord, embodied in a consent decree (the Decree)
entered by the hearing officer.  The Decree confirmed Adams'
entitlement to a FAPE and obligated the school district in which
the prison was located to develop an individualized education
program (IEP) for each year of a two-year span (apparently
compensating for a period during which Adams had not received a
FAPE).  The IEP took effect early in 1993.  The burden of
implementation fell on the State.
    When the parties framed the IEP, Adams was classified by
correctional authorities as a moderately high-risk (C-4) inmate and
housed accordingly.  This classification permitted full
implementation of his IEP.  Adams thereafter committed a series of
disciplinary infractions, resulting in a change of classification
to C-5 (maximum security risk) and placement in the prison's secure
housing unit (SHU).  Inmates housed in the SHU are subject to
severe constraints  on movement (e.g., they are permitted neither
to interact with convicts in other classifications nor to leave the
SHU except for medical emergencies and other exigencies).  On the
infrequent occasions when they do depart the SHU, C-5 inmates are
handcuffed, shackled, and accompanied by guards.  Thus, although
the IEP entitled Adams to 5 hours of daily instruction and
counseling   an entitlement that the State initially fulfilled   
his placement in the SHU led ineluctably to a disruption of this
schedule.
    Faced with a conflict between the realization of
legitimate security considerations and literal compliance with the
IEP's terms, the State asserted the primacy of the former.  Adams
disagreed and again sought a due process hearing.  The essence of
his complaint was that the security constraints which impeded
delivery of the requisite educational services to inmates in the
SHU did not amount to a valid justification for shirking
responsibilities imposed under the IDEA.  An administrative hearing
was held, see 20 U.S.C.  1415(b)(2), and, at its conclusion, Adams
filed a "Request for Relief."  In it, he sought to compel the State
to deliver the promised educational programs according to the tenor
of the IEP, regardless of his security classification, and to
provide an additional period of education to compensate for
intervals during which the State had refused to do so.
    The hearing officer accepted Adams' thesis:  he concluded
that the IDEA trumped the prison's security regime and held that,
by putting security uppermost, the State had failed to satisfy its
obligations under the IEP.  Consequently, he ordered the State
either to allow the IEP to be implemented within the SHU as
written, or, in the alternative, to permit Adams to leave the SHU
to attend classes, notwithstanding his security classification.  
The hearing officer also granted Adams an additional period of
compensatory education equal to the period from December 16, 1992,
until the State began fully implementing Adams' IEP.
    The State petitioned the district court for judicial
review of this decision.  See 20 U.S.C.  1415(e)(2).  While the
appeal was pending, Adams' initial IEP expired.  Thereafter, on
March 21, 1996, the district court, concluding that the IDEA did
not override the State's penological interests, vacated the hearing
officer's orders.  Rather than remanding the case, the court
retained jurisdiction and directed the parties to develop a new
IEP, taking into account (1) Adams' entitlement to a FAPE while
incarcerated; (2) the State's legitimate security and other
penological concerns; (3) the potentiality of Adams'
reclassification and the need for any revised IEP to avoid
"thwart[ing] the prison's legitimate need to preserve order and
discipline among inmates"; and (4) the importance of flexibility
and the need to reach accommodations.
    Some nine months later, the parties negotiated an
agreement (the Agreement) that established a new IEP under which
Adams, then 25 years of age, was to receive two additional years of
compensatory education.  The new IEP was patterned on the old IEP
but, because Adams had graduated from high school during the
implementation of the old IEP, the substance of the new IEP was
altered slightly to incorporate several college-level courses.
    After the parties advised the district court of the
Agreement, Adams revivified his earlier claim for counsel fees,
asseverating that he had prevailed because the adversary
proceedings produced the neoteric IEP (which, in his view, afforded
him substantial benefits that he otherwise would not have
obtained).  The State demurred, arguing that the court's vacation
of the hearing officer's orders demonstrated that it, not Adams,
was victorious in the adversary proceedings, and that the context
in which the second IEP was developed demonstrated both the
relative insignificance of the relief obtained and the attenuation
of the asserted causal link between the adversary proceedings and
that relief.  The district court agreed with the State on both
scores and denied Adams' application.  This appeal followed.
II.  ANALYSIS
    The central issue in this case relates to whether  Adams
prevailed within the purview of 20 U.S.C.  1415(e)(4)(B), which
permits a district court, in its discretion, to "award reasonable
attorneys' fees as part of the costs to the parents . . . of a
child or youth with a disability who is the prevailing party."  The
appropriate analytic framework requires a fee-seeker to show both
materiality and causation as prerequisites to achieving prevailing
party status.  See Farrar v. Hobby, 506 U.S. 103, 111-12 (1992).  
In conducting this tamisage, and in construing section
1415(e)(4)(B) generally, cases decided under kindred federal fee-
shifting statutes, such as the Fees Act, 42 U.S.C.  1988, furnish
persuasive authority.  See Kathleen H. v. Massachusetts Dep't of
Educ., ___ F.3d ___, ___ (1st Cir. 1998) [No. 98-1006, slip op. at
13].
    The materiality component requires that, to qualify as a
prevailing party, one must succeed on some significant claim within
the litigation, thereby achieving at least some of the relief
envisioned.  See Texas State Teachers Ass'n v. Garland Indep. Sch.
Dist., 489 U.S. 782, 791 (1989).  In the Court's words, a plaintiff
satisfies the materiality component when he achieves "relief on the
merits of his claim" and that relief "materially alters the legal
relationship between the parties by modifying the defendant's
behavior in a way that directly benefits the plaintiff."  Farrar,
506 U.S. at 111-12.  The causation component of the prevailing
party inquiry is similarly straightforward.  It requires that "the
party either must have enjoyed some bottom-line litigatory success
or her suit must have had a catalytic effect in bringing about a
desired result."  Guglietti v. Secretary of HHS, 900 F.2d 397, 399
(1st Cir. 1990).  The basic standard of review is for abuse of
discretion.  See Kathleen H., ___ F.3d at ___ [slip op. at 14];
McDonald v. Secretary of HHS, 884 F.2d 1468, 1474 (1st Cir. 1989).
    In this instance the district court resolved both aspects
of the prevailment inquiry adversely to the appellant.  As to
materiality, the court noted that the struggle for primacy between
the State's penological and security interests, on one hand, and
Adams' interest in literal compliance with the IEP, on the other
hand, formed the centerpiece of the dispute.  Because the State won
this struggle   indeed, that triumph formed the basis for the
district court's vacation of the hearing officer's orders   it
"prevailed" completely.  Concomitantly, the court said that Adams
"prevailed" on no claim that yielded significant relief; the
additional compensatory education that he gained was de minimis in
the broader context of the litigation and the Agreement neither
"materially altered the nature of [the parties'] legal
relationship, nor . . . compel[led] the State to modify its
behavior in a way th[at] directly benefitted Adams."  We reiterate
this holding, but we do not evaluate it.  One who seeks "prevailing
party" status under the IDEA must prove both materiality and
causation, and, since causation is dispositive here, see infra, we
elect to focus on the latter.
    On the question of causation, the district court held
flatly that Adams' resort to the adversary process earned him
nothing that he could not easily have obtained for the asking.  
Assuming arguendo that additional secondary education represents
significant relief (as the appellant asserts), the question of
causation boils down to whether the pursuit of adversarial
proceedings precipitated that relief.  As the fee-seeker, Adams
must carry the devoir of persuasion on this issue.  See Hensley v.
Eckerhart, 461 U.S. 424, 437 (1983).  He may do so in one of two
ways:  through either a "merits" or a "catalyst" theory of
causation.  See Nadeau v. Helgemoe, 581 F.2d 275, 278-79 (1st Cir.
1978).  Because the appellant tries to travel both routes, we
address these alternatives in sequence.
                      A.  The Merits Test.
    A fee-seeker who aspires to prevailing party status may
make the requisite showing of causation by satisfying the merits
test.  "[T]he merits test 'states the obvious, namely, that a party
has prevailed if [he] wins the litigation.'"  Langton v. Johnston,
928 F.2d 1206, 1224 (1st Cir. 1991) (quoting Coalition for Basic
Human Needs v. King, 691 F.2d 597, 599 (1st Cir. 1982)).  In this
iteration of his plea, the appellant argues that, even though the
district court vacated a set of administrative orders favorable to
him, its ruling amounted to a victory because the ruling implicitly
acknowledged that the State had denied him a FAPE while he
languished in the SHU.  To mount this argument, Adams positions the
denial of a FAPE as the foundation for his overarching claim and
posits that, since the district court impliedly recognized such a
denial when it directed the parties to negotiate, the court's order
was the functional equivalent of a vindication on the merits.
    This argument reads too much into the district court's
ruling.  In approving the State's subordination of the IEP's
requirements to the security concerns created by Adams' own
actions, the district court logically implied that no FAPE
violation had occurred.  Indeed, the court specifically said during
the subsequent hearing on Adams' motion for fees:  "Marc Adams
wasn't denied free appropriate education while in SHU."  And the
court's subsequent written order on attorneys' fees stated bluntly
that it had resolved the central legal issue against Adams.
    We have held before that a district court is the best
explicator of its own orders, see, e.g., Martha's Vineyard Scuba
Headquarters, Inc., v. Unidentified, Wrecked and Abandoned Steam
Vessel, 833 F.2d 1059, 1066-67 (1st Cir. 1987); Lefkowitz v. Fair,
816 F.2d 17, 22 (1st Cir. 1987), and this case offers no occasion
to contravene that principle.  The parties' negotiation of a
revised IEP, subsequent to Adams' defeat in the district court,
could not transform a loss into a win.
                     B.  The Catalyst Test.
    The appellant's fallback position rests on the catalyst
theory.  To achieve prevailing party status under this theory, a
fee-seeker must demonstrate that his action served a provocative
function in the calculus of relief, see Guglietti, 900 F.2d at 401,
or, stated another way, that it "act[ed] as a 'catalyst' in
prompting defendants to take action to meet plaintiff's claims,"
Nadeau, 581 F.2d at 279.  If this condition is met, and the action
taken is material, then the plaintiff will be deemed a prevailing
party "despite the lack of judicial involvement in the result."  
Id.
    Almost by definition, causation questions are fact-
contingent, see, e.g., Peckham v. Continental Casualty Ins. Co.,
895 F.2d 830, 837 (1st Cir. 1990), and are best visualized from a
trial court's more intimate perspective.  The trial court often is
"in the best position to sort out coincidence from effect."  
Langton, 928 F.2d at 1225.  Even in a situation where some of the
critical events took place in an administrative forum, the trial
court is closer to the matter than is an appellate tribunal.  
Consequently, we afford deferential review to such determinations,
setting them aside only for abuse of discretion.  See id.
    The appellant posits that the filing of his second due
process request brought about a beneficial result (additional
compensatory education) that he otherwise would not have obtained.  
In its fee-denial order, the district court rejected this thesis.  
The court appropriately referenced the context in which the parties
forged the Agreement to demonstrate why the two additional years of
compensatory education were not causally linked to the due process
request.  It then stated:
    Adams obtained nothing in the . . . settlement
    agreement that he would not have obtained had
    he made a reasonable effort to resolve the
    situation amicably in 1993, rather than:  (1)
    invoke the administrative remedies available
    under the IDEA; and (2) interpose what was
    undeniably an unreasonable condition of
    settlement (i.e. full implementation of an
    unmodified IEP while he was in SHU).

    The appellant vigorously disputes this determination.  To
bolster his view, he adverts to occasions during the course of the
underlying proceedings when the State argued against the provision
of additional compensatory education.  This line of reasoning fails
to account for the distorting force of litigation.  While the cited
statements (e.g., a letter dated February 10, 1996, from the
State's counsel to the appellant's counsel) clearly reflect some
recalcitrance on the State's part vis--vis additional compensatory
education, the proper vector point for a catalyst analysis must be
the defendant's position on the claim for relief prior to the onset
of litigation   not jousting points taken in the heat of battle.  
Positions adopted by parties during the course of adversarial
proceedings cannot be taken at face value because they tend to be
artificially inflated.  
    Viewing matters in this light, the district court found
that the State's reticence was no more than an understandable
litigatory posture, taken in response to what the court
characterized as a patently unreasonable demand on Adams' part.  In
the court's estimation, it was Adams' unflagging insistence on full
implementation of his IEP notwithstanding his placement in the SHU
that impeded a satisfactory resolution of the matter and required
the parties to go head to head.  The record supports this
assessment.  It seems plain, as the district court noted, that the
genesis of the dispute concerned whether Adams' IEP requirements
had to yield to countervailing security concerns, and that this
issue became the focal point of the adversary proceeding.  The
district court's resulting inference   that, but for this
controversy, a settlement which included additional compensatory
education probably could have been reached without resort to
litigation   seems eminently reasonable.  This circumstance defeats
the appellant's claim.  See Kathleen H., ___ F.3d at ___ [slip op.
at 18] (explaining that the fee-seeker must show that the school
district would not have included the alleged benefit in the new IEP
but for the litigation); Payne v. Board of Educ., 88 F.3d 392, 400
(6th Cir. 1996) (similar).
    In all events, there is a lacuna in the appellant's
proof.  A party who seeks fees under a catalyst theory must show
that the relief ultimately obtained was sought (or at least easily
inferrable from what was sought) and refused (expressly or by fair
implication) prior to the commencement of a contested hearing.  SeeJohnson v. Bismarck Public Sch. Dist., 949 F.2d 1000, 1003 (8th
Cir. 1991) (finding causal relationship lacking between the filing
of a complaint and additional compensatory education when the
plaintiff had failed to pursue this relief prior to filing a due
process complaint); cf. Kathleen H., ___ F.3d at ___ [slip op. at
15-17] (rejecting the plaintiffs' characterization of their overall
goal and relying in part on the absence of any evidence that the
school district would have failed to provide the services
ultimately awarded but for the administrative hearing).  Adams
offered no such proof.
    The only evidence adduced here anent the State's pre-
litigation posture bears on the issue of whether the legal
obligations created by the initial IEP sufficed to override the
State's penological policies.  This is consistent with the
appellant's concession that the State's unwillingness to accede to
his demand for full implementation of the IEP's provisions while he
was housed in the SHU constituted the motivating factor prompting
his petition for a due process hearing.  In short, the possibility
of affording Adams additional compensatory education to offset the
forced deprivation of services occasioned by his placement in the
SHU was not addressed prior to the institution of adversarial
proceedings.  Given the paucity of other proof, this omission dooms
the plaintiff's claim.
    In a last-ditch effort to fill this void, Adams suggests
that his abortive attempts to reach a negotiated resolution prior
to initiating a due process hearing demonstrate that litigation was
his only viable avenue for relief.  This suggestion obscures the
question of what terms he attempted to negotiate.  A party who asks
for the moon and the stars, and then sues and loses, cannot expect
to receive fees when he thereafter settles for the same lesser
constellation that his target likely would have been willing, all
along, to provide.  So it is here:  Adams never made a demand for
additional compensatory education as a solution to the SHU problem
prior to his due process hearing.  To the contrary, he demanded
only a deviation from prison regulations in order fully to
accommodate the IEP already in place.  In the district court's
words, "[s]imply because Adams subsequently negotiated a revised
IEP with which he is now satisfied does not entitle him to recover
the substantial sums which were expended in what was a meritless
effort to force the State to subordinate its penological interests
to his IEP as written, notwithstanding obvious conflicts with the
prison's legitimate security and operational goals."
    To sum up, Adams bore the burden of demonstrating that he
would not have received additional compensatory education but for
the prosecution of his due process request.  To do that, he needed
to produce some convincing indication of the State's unreadiness to
provide compensatory education.  The district court found that
Adams failed to make the requisite showing.  The sticking point,
according to the court, was the appellant's obdurate insistence on
an acknowledgment that his IEP trumped the security concerns
embedded in the State's correctional policy, so that, even if he
remained in the SHU, he would be allowed to attend classes as
called for by his IEP.  But for this insistence, the court
reasoned, the State, if asked to furnish compensatory education for
time spent in the SHU, likely would have acquiesced.  These
findings are reasoned and comport with a plausible rendition of the
evidence.  Thus, the lower court did not abuse its discretion in
determining that Adams failed to establish the necessary causal
connection between litigation and relief.
    We need go no further.  The prevailing party requirement
is an incentive mechanism designed to encourage prompt resolution
of meritorious claims and to discourage unnecessary litigation.  
This policy rationale, evidenced in the Court's treatment of
marginal victories, see, Farrar, 506 U.S. at 115, and unrelated
claims, see, Hensley, 461 U.S. at 435, is served by declining to
award fees when litigation yields only relief that in all
probability was attainable without the time and expense of
adversarial proceedings.

Affirmed.

</body>

</html>